UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JAMES RYAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.: 3:14-CV-356-TAV-HBG |
| | ) |
| TENNESSEE VALLEY AUTHORITY, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

This action is before the Court on TVA's Motion for Summary Judgment on All Phase II Issues as to the Tract Involved in this Case – Roane County Tax Parcel No. 017N B 017.00 Located at 303 Ayres Drive, Harriman, Tennessee [Doc. 6]. Plaintiff has not filed a response to the motion, and the time for responding has expired. E.D. Tenn. L.R. 7.1, 7.2. After careful consideration of the record and relevant law, and for the reasons explained herein, the Court will grant the motion for summary judgment and dismiss this case.

**I.    Background**

This case was severed from the TVA Ash Spill Litigation, Case Number 3:09-CV-54-TAV-HBG [Doc. 1]. In that action, TVA moved for summary judgment on no-causation grounds with respect to numerous tracts in the TVA Ash Spill Litigation, but TVA did not provide tract-by-tract factual analysis for all of the involved tracts. Viewing the collective evidence of record in the light most favorable to plaintiffs, the Court denied

TVA's motion as to "pure property damage, trespass, and nuisance" as to all tracts. *In re TVA Ash Spill Litigation* (*2011 Ash Spill Litigation*), 805 F. Supp. 2d 468, 495 (E.D. Tenn. 2011). TVA now moves the Court for summary judgment as to the specific tract of real property involved in this case.

Plaintiff James Ryan's claims are based upon his ownership of a tract of property at 303 Ayres Drive in Harriman, Roane County, Tennessee (the "subject tract") [Case No. 3:09-CV-54-TAV-HBG Doc. ("*Auchard* Doc.") 437 PageID 7718]. Plaintiff purchased the subject tract at a tax sale in 2006 for $10,500, and he made improvements to the house on the property before making it his residence in 2007 [Doc. 6-1 p. 5–6]. As indicated by Google Maps,[1] the subject tract is on a Harriman city street on the north side of Harriman. The tract is about 2.8 miles northwest of the ash spill site, about 0.4 mile from the Emory River at its closest point, and about 0.3 mile north of Harriman High School [Doc. 5 ¶¶ 3–4].

Plaintiff claims that the ash from the spill "physically invaded and contaminated" his property [*Auchard* Doc. 437 PageID 7732]. And he alleges the ash "invaded and contaminated a large swath of the land and river nearby" his property [*Id.* at 7731]. Plaintiff seeks compensatory damages for the diminution in market value of his property and for the loss and use and enjoyment of his property [*Id.* at 7741].

---

[1] The Court may take judicial notice of Google Maps to determine distances and locations. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013); *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013); *Eden Isle Marina, Inc. v United States*, 113 Fed. Cl. 372, 471 n.138 (2013).

In his April 2011 deposition, plaintiff testified that his subjective feelings had caused him to make changes in his actual and potential uses of the subject tract and the nearby river:

> Q. You said also that you're making a claim for loss of use and enjoyment of the Ayers Drive property, and I just wanted to ask you, what are the elements of that claim for you?
>
> A. Well, you know, as I mentioned before, you know, I wanted to -- I had in mind going out and using -- you know, building a garage and, you know, tinkering on cars and maybe, you know, putting out grass, you know, play football, you know, play outside and stuff like that. And I feel that the property is contaminated. I feel as though, you know, if I fall down and skin my arm or something like that playing football or something, you know, it's not going to be helpful to me.
>
> Q. Anything else, use or enjoyment of the property, that you feel has been impacted besides -- I think you described earlier no longer want to build a garage there and no longer want to go outside and maybe play football, for example.
>
> A. Yeah. Just don't want to be outside. Don't want to, you know, work in the yard. I enjoy, you know, working on -- you know, I was going to build a fountain in the front and just do yard work and kind of do the things you do on a Sunday afternoon or a Saturday that, you know, people do.
>
> Q. And you're not physically prevented from doing those things. You could do them if you wanted. It's just you don't have the desire. Is that correct?
>
> A. That's right.
>
> Q. Have you done any yard work since December 2008?
>
> A. Since -- yeah. I've had to mow the lawn sometimes. Sometimes I had somebody do it for me.

3

> Q. Besides construction projects like building a garage or a fountain, are there any other outdoor activities on the property that you did prior to the spill that you don't do anymore?
>
> A. Well, it was pretty new when I got it. You know, I had the land all graded off and everything, and I was working on, you know, putting a lawn in and stuff like that and getting everything, you know, situated. And like I say, I just am not interested in it anymore. So -- same thing.

[Doc. 6-1 p. 15–17].

When plaintiff moved to the subject property in 2007, he already owned a boat and he purchased a second boat in 2007 "that [he] was going to use" [*Id.* at 19]. He sold both boats after the spill, asserting it "[j]ust didn't interest [him] anymore about being on the water" [*Id.*].

Regarding the ash on the subject tract and physical damage, plaintiff contends that fly ash particles entered onto his property through the air and discolored the siding on his home immediately after the spill [*Id.* at 9–11, 18]. He removed the discoloration by pressure washing the siding within a week of the spill [*Id.* at 11]. Other than this, plaintiff asserts that he did not see anything else on his property that he believed to be ash:

> Q. Other than what you've said you've observed on your siding on your home, have there been any other locations on your property where you've observed something you believe to be connected to the Kingston ash spill or fly ash?
>
> A. No. No, I can't say that I have. It's just like, like I mentioned, you know, you're not going to have big chunks of fly ash coming streaming over the mountains. It's not physically possible. The stuff has got to be suspended in the air.

4

[*Id.* at 13]. When asked to explain why he believed that fly ash was suspended in the air, plaintiff said that he was relying upon "common sense" and that he would have to "go by whatever the scientists [opine]" [*Id.* at 13–14]. Plaintiff also testified there had been no environmental testing or analysis of his property. For example:

> Q. And I just wanted to ask you, have you had any testing or analysis of the soil on the 303 Ayers Drive property performed?
>
> A. No, not really. No, I haven't.
>
> Q. What about have you had any testing or analysis performed of the air on the 303 Ayers Drive property?
>
> A. No.
>
> Q. And do you have any knowledge of the location of any air monitoring stations that are in your area?
>
> A. Not really. I don't know anything about that.

[*Id.* at 7–8]. And further:

> Q. Did you ever have the dirt that you were describing on the side of your home on the siding, did you ever have that tested or analyzed?
>
> A. No.
>
> Q. So then is it fair to say that you don't know for a fact whether it came from the Kingston ash spill?
>
> A. Well, I mean, nothing is for sure in life. So -- but, you know, there's a good chance because -- you know, as far as coinciding with the events.

[*Id.* at 12].

Evidence submitted by TVA indicates that at the time of the ash spill, there were sixteen PM2.5 monitors within forty miles of the spill site, including two monitors

5

located at Harriman High School, just 0.3 mile from the subject tract, that were providing data to the United States Environmental Protection Agency ("EPA") Air Quality System ("AQS"), which is a computerized system for storing air quality data obtained by Federal and State agencies and other entities to assess air quality, designate attainment/nonattainment areas, and perform modeling and other air quality management functions [*Auchard* Doc. 161-1 PageID 4962–64, 4967]. Within days after the ash spill, TVA also established air monitoring, and the air monitoring data from that network was made publically available at http://www.tva.gov/kingston/air/index.htm.[2] The EPA regularly audited TVA's air monitoring network, which included air monitoring data from the two PM2.5 air monitors at Harriman High School, and those audits were made publically available.[3] The audits found that the air monitoring network met performance standards.

Based upon the analysis of hundreds of thousands of readings from air monitors around the spill site, including those at Harriman High School in the immediate vicinity of the subject tract, the Tennessee Department of Health's September 7, 2010, Final

---

[2] The Court may take judicial notice of "public records and government documents available from reliable sources on the Internet." *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). *See also Paralyzed Veterans of Am. v. McPherson*, No. C 06-4670 SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008).

[3] U.S. EPA, *Annual Performance Audits, Network Review, and Data Review of the Ambient Air Monitoring Network at the Kingston, Tennessee Fossil Plant Fly Ash Removal Project*, at 7 (Dec. 12, 2012), *available at* http://www.epakingstontva.com/EPA%20Air%20Audits%20and%20Reviews/Air%20Audit%20Reports/2012%20Air%20Audits/EPA%20Air%20Audit_December%202012.pdf ("TVA continues to operate an excellent air monitoring network at the Kingston Fossil Plant.").

Public Health Assessment reported that the ash spill did not "increase[] particulate matter . . . in ambient air around the site" [*Auchard* Doc. 161-2 PageID 5000], and "air data from all the agencies indicated that particulate matter was not elevated in the ambient air surrounding the ash spill" [*Id.* at 5257]. And regarding the five days between the spill and the beginning of air monitoring, the Public Health Assessment concluded: "The coal ash was wet when it spilled. Wet weather for three days after the spill, combined with low temperatures and slow wind speeds, would have kept the coal ash from drying out and getting in to the air" [*Id.* at 5012].

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477

U.S. at 317).  To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder.  *Anderson*, 477 U.S. at 250.  The Court does not weigh the evidence or determine the truth of the matter.  *Id.* at 249.  Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).  Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

### III. Analysis

After conducting a Phase I trial in the TVA Ash Spill Litigation, the Court held that nondiscretionary tortious conduct by TVA was a proximate cause of the ash spill, and that, as a result, TVA potentially is subject to liability in tort under theories of private nuisance, trespass, and negligence causing pure property damage.  *2012 TVA Ash Spill*

8

*Litigation*, 2012 WL 3647704, at *62. The Court summarized plaintiff's burden going forward as follows:

> [E]ach plaintiff in the TVA Ash Spill Litigation now faces an individualized burden in the Phase II proceedings. In Phase II, each plaintiff must prove the elements of his or her respective negligence, trespass, and/or private nuisance claims by a preponderance of the evidence. . . . [Those] individualized issues includ[e]: whether coal ash is or was present on each plaintiff's specific property; whether the presence of the coal ash on the specific property can be traced to TVA's nondiscretionary conduct; whether the coal ash has damaged each specific property; whether and how the coal ash affects each plaintiff's use and enjoyment of said property; and the amount of damage, if any, to each property and to each plaintiff.

*Id.* at *5. TVA now asserts that plaintiff cannot establish the elements necessary to recover under any of the three tort theories remaining in this case. *2011 TVA Ash Spill Litigation*, 805 F. Supp. at 468. *See also In re TVA Ash Spill Litigation* (*2012 TVA Ash Spill Litigation*), 2012 WL 3647704, at *62 (E.D. Tenn. Aug. 23, 2012) (dismissing plaintiff's claims of "negligence per se, recklessness, strict liability, and public nuisance").

    **A.**    **Private Nuisance**

To establish private nuisance, plaintiff must demonstrate that fly ash from the ash spill, on or near the subject tract, "constitutes an invasion of legally protectable *property interests* that rises to the level of what a reasonable person with ordinary sensibilities would consider an unreasonable interference with the use and enjoyment of property." *2011 Ash Spill Litigation*, 805 F. Supp. 2d at 488. To determine whether "a particular use of property is a nuisance, the Court must look to "its effect upon persons of ordinary

9

health and sensibilities, and ordinary modes of living, and not upon those who, on the one hand, are morbid or fastidious or peculiarly susceptible to the thing complained of, or, on the other hand, are unusually insensible thereto." *Jenkins v. CSX Transp., Inc.*, 906 S.W.2d 460, 462 (Tenn. Ct. App. 1995) (citation omitted). In other words, "'[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in the normal condition and used for a normal purpose.'" *Id.* (alteration in original and citation omitted).

TVA argues that the uses and potential uses of the subject tract did not change in any significant, material, or substantial manner as a result of the spill. Upon review of the record, the Court agrees. Plaintiff's subjective concerns about the property do not provide a basis for a private nuisance claim, as "the fears of mankind will not alone create a nuisance." *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1951). *See also Freeman v. Blue Ridge Paper Prods.*, 529 F. App'x 719, 727 (6th Cir. 2013) (stating that "to allow for recovery of fear-based claims that are ungrounded in scientifically verified evidence is a sweeping declaration in support of which Plaintiffs have offered no North Carolina authority"); *Reid v. Memphis Mem'l Park*, 5 Tenn. App. 105 (1927) (finding that the law does not protect against devaluation injury resulting from "'merely fanciful'" disquietude (citation omitted)). Moreover, plaintiff's lack of interest about being on the water due to any unsightliness of the Emory River or Watts Bar Reservoir does not give rise to a private nuisance claim. *Reid*, 5 Tenn. App. at 117, 121 (finding that a cemetery is not a

10

nuisance merely because it is offensive to the "aesthetic sense" or "aesthetic tastes" of adjoining owners). And because plaintiff is not a riparian owner, he has no property interest in the Emory River or Watts Bar Reservoir upon which to base a claim. Indeed, even if he were a riparian owner, his rights would not support a finding of private nuisance based upon any claim of diminished recreational opportunities. *Mildenberger v. United States*, 643 F.3d 938, 948 (Fed. Cir. 2011) ("The right [of a riparian owner] to have access to the water refers to physical access to the edge of the water, not access to its full potential, including swimming and viewing wildlife."). Finally, plaintiff has no legally protectable private property right or interest to navigate the Emory River or Watts Bar Reservoir free of obstructions; to the extent TVA's actionable conduct caused any obstructions to navigation, any claim based thereon would be for public nuisance, not private nuisance. *See Felton v. Ackerman*, 61 F. 225, 227 (6th Cir. 1894) ("[T]he authorities are quite clear to the point that such a damage [obstruction of a public way] is not one which can be remedied by private action. It is a damage which the public share with the particular complainant."); *Lowery v. Petree*, 76 Tenn. 674, 678 (1881) ("No person can maintain an action for damages for a common nuisance [obstruction of a public way], where the injury and damage are common to all."); *see also Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 259 (9th Cir. 1973) ("There is no right under California law to recover for damage [caused by pollution] to the navigational rights [in Santa Barbara Channel] enjoyed by these plaintiffs. . . . [P]laintiffs' claim is not for 'loss of use' of their boats; the boats themselves were perfectly usable. Rather, the claim is for loss of

11

'navigation rights' in the Santa Barbara Channel. Thus their claim is, under California law, a claim for damages arising out of a public nuisance.").

Accordingly, for these reasons, and pursuant to Rule 56(e)(3),[4] the Court will dismiss plaintiff's private nuisance claim.

### B. Private Trespass and Negligence

To recover under a private trespass or negligence theory, plaintiff must show that "particles from the ash spill, either tangible or intangible, entered plaintiff['s] propert[y] and would not have done so 'but for' actionable conduct by TVA." *2011 TVA Ash Spill Litigation*, 805 F. Supp. 2d at 484. *See also 2012 TVA Ash Spill Litigation*, 2012 WL 3647704, at *62 (noting that it is a "threshold requirement that each plaintiff show that tangible or intangible particles from the coal ash spill actually entered their respective properties"). TVA asserts plaintiff cannot meet this specific causation requirement, and the Court agrees.

TVA submits that the expert reports plaintiff furnished to TVA do not provide a basis for concluding that any ash particles in fact entered the subject tract and would not have done so "but for" TVA's actionable conduct. Moreover, TVA has submitted evidence that, based on the analysis of hundreds of thousands of readings from air monitors around the spill site, the Tennessee Department of Health's September 7, 2010, Final Public Health Assessment reported that the ash spill did not "increase[] particulate

---

[4] Rule 56(e)(3) provides: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]"

matter . . . in ambient air around the site" and "air data from all the agencies indicated that particulate matter was not elevated in the ambient air surrounding the ash spill" [*Auchard* Doc. 161-2 PageID 5000, 5257]. And with respect to the five days between the spill and the beginning of air monitoring, the Public Health Assessment concluded: "The coal ash was wet when it spilled. Wet weather for three days after the spill, combined with low temperatures and slow wind speeds, would have kept the coal ash from drying out and getting into the air" [*Id.* at 5012].[5]

Accordingly, for this reason, and pursuant to Rule 56(e)(3), the Court will dismiss plaintiff's private trespass and negligence claims.

## IV. Conclusion

For the reasons stated herein, the Court will **GRANT** TVA's motion for summary judgment [Doc. 6] and **DISMISS** this case. The Clerk of Court will be **DIRECTED** to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Assuming plaintiff could demonstrate some ash particles had entered the subject tract, the Court finds nothing in the record that indicates he would be able to demonstrate any such particles resulted from actionable conduct of TVA. This is, at least in part, because TVA submits fly ash particles have been present in the general area for many decades due to the operation of the Kingston Fossil Plant and other coal-fired industrial plants.